United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL ANDERSON and COURTNEY MURPHREE,

    Plaintiffs,

  v.

USAA CASUALTY INSURANCE COMPANY,

    Defendant.

No. C 06-07948 WHA

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this insurance action, plaintiffs Michael Anderson and Courtney Murphree are suing defendant USAA Casualty Insurance Company for failing to pay a property-damage claim. Defendant now moves for summary judgment on the grounds that the insurance policy at issue did not cover the claim submitted by plaintiffs. For the reasons stated below, the motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

## STATEMENT

Plaintiffs returned from a weekend trip and discovered cracking damage in their house. Their theory is that leakage from the radiant (floor) heating system caused the damage, which they claim would be a covered event under their insurance policy. USAA, on the other hand, contends that the leakage was caused by foundation movement, which would not be a covered event.

Plaintiffs live in an single-story family dwelling located in this district insured by USAA at all relevant times. The insurance policy provided, in relevant part (Def. Exh. 1) (with italics used to indicate key passages):

**DEFINITIONS**

**6.** "property damage" means physical damage to, or destruction of tangible property, including loss of use of this property.

\* \* \*

**SECTION I — PROPERTY COVERAGES**

COVERAGE A — Dwelling

We cover:

**1.** *the dwelling on the residence premises shown in the Declarations, including structures attached to the dwelling*;

**2.** materials and supplies located on or next to the residence premises used to construct, alter or repair the dwelling or other structures on the residence premises; and

**3.** permanently installed carpeting.

\* \* \*

**SECTION I — PERILS INSURED AGAINST**

We insure against risks of direct, physical loss to property described in Coverages A and B; however, we do *not* insure loss:

**2.** *caused by . . . **e.** constant or repeated seepage or leakage of water or steam over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance*;

**3.** *caused by or consisting of: **a.** wear and tear, marring, deterioration . . . **f.** settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings.*

\* \* \*

**SECTION I — EXCLUSIONS**

**1.** We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

2

> **b.** *Earth movement, meaning earthquake including . . .
> earth sinking, rising or shifting*; unless direct loss caused by:
> (1) fire; (2) explosion; or (3) breakage of glass or safety glazing
> material which is part of a building, storm door or storm window;
> ensues and then we will pay only for the ensuing loss.
> This exclusion does not apply to loss by theft.
>
> **c.** *Water Damage, meaning . . . (3) water below the surface of the
> ground, including water which exerts pressure on or seeps or leaks
> through a building, sidewalk, driveway, foundation, swimming
> pool or other structure.* Direct loss by fire, explosion or theft
> resulting from water damage is covered.
>
> **e. Neglect**, meaning neglect of the **insured** to use all reasonable
> means to save and preserve property at and after the time of a loss.
>
> **2.** We do not insure against loss consisting of any of the
> following. Nor do we insure for loss that results when one or more
> of the following combines with other causes, events or conditions
> that are also excluded or excepted in this policy. However, any
> loss that ensues from the following, that is not otherwise excluded
> or excepted is covered.
>
> \* \* \*
>
> **b. Faulty, negligent, inadequate or defective** . . . *(2) design,
> specifications, workmanship; repair, construction, renovation,
> remodeling, grading, compaction . . . (4) maintenance;
> of part or all of any property whether on or off the residence
> premises.*

On August 10, 2005, Ms. Murphree called USAA to report cracking in the walls and floors of the north side of the home and parts of the walls on the east side. The rooms affected were the kitchen, guest bathroom, dining room, and guest bedroom. There was damage to kitchen cabinets and counters and the separation in the floor between the dining room and living room. Ms. Murphree explained that she and Mr. Anderson had left town for the weekend, and, when they returned on Sunday evening, they discovered a large crack in the dining room wall. They checked around the house and found other cracks, including corresponding cracks on the exterior of the home. Although there were some preexisting older cracks elsewhere, plaintiffs claim that the reported cracks were new and did not exist before they left for their weekend trip.

A week later, USAA property claims adjuster Douglas Dunkly met with plaintiffs to inspect the property. He explained to them that there were potential exclusions for wear and tear, settling, cracking, earth movement, faulty/inadequate construction/grading, surface and

3

subsurface water and tree-root intrusion. Mr. Anderson told him that, about a year beforehand, they had experienced a leak in the radiant heating system, which Mr. Anderson had attempted to fix himself. Mr. Anderson asked whether that leak or a subsequent plumbing leak could have affected the cracking. In response, Adjuster Dunkly hired American Leak Detection to conduct a leak detection test and a structural engineer to evaluate the cause of the damage. If the cracking had been caused by a leak in the radiant heating system, the damage was arguably covered by the policy. Plaintiffs claim that the earlier leak, which Mr. Anderson successfully repaired, occurred at the connection between the living room and dining room, in an entirely different location than the new cracking, which first appeared in August 2005. This earlier leak, plaintiffs say, did *not* cause the new cracking. USAA disputes that the new cracking occurred in an entirely different part of the house.

On August 19, 2005, American Leak Detection electronically tested the domestic hot and cold water systems and radiant heat system. It found that the radiant heat system was leaking, with the highest electronic readings located in the kitchen. This finding by American Leak Detection seemed to support plaintiffs' damage theory — unless the leakage had been ongoing over a period of weeks, months or years, in which case it would have supported USAA.

At the end of August 2005, USAA property claims adjuster David Cady assumed responsibility for plaintiffs' claim because Adjuster Dunkly was reassigned to work on claims arising from Hurricane Katrina. USAA also hired James Miller, a civil engineer from EFI Global, to determine the cause of the plaster wall cracking, floor tile cracking and cabinet distress. Engineer Miller was supposed to opine as to whether a leak in the radiant heat system was related to the damage in the property.

In his deposition, Adjuster Cady later acknowledged having used EFI Global on ten to twenty previous occasions. Engineer Miller himself stated that he had been frequently retained by insurance companies, including USAA. When asked whether he got involved in insurance-coverage issues or interpreted the policies, Engineer Miller responded, "We don't get into any kind of issues with coverage. We're sent out as engineers for, normally, a causation

4

report. So as far as coverage is concerned we don't deal with that at all . . . [W]e go out and examine some damage and assess why it occurred. That's the sum total of our work" (Pl. Exh. 10 at 9–10).

In September 2005, Mr. Cady and Engineer Miller inspected the residence. Engineer Miller agreed that some of the cracks seemed newer (as opposed to the smaller cracks that preexisted August 2005). At a later deposition, Engineer Miller was asked "whether those cracks at the back of the property [where a leak was found to the radiant heat system], to your observation, appeared new or what the age of those cracks appeared to be from your observation." Engineer Miller responded, "I wouldn't be able to tell you how old they were. I could tell you if they were newer or older. And that is what my statement was in IMS [the claim activity log], that they looked newer" (Pl. Exh. 8 at 48). Therefore it was possible that the cracks were new and did not first appear until August 2005.

Engineer Miller's report concluded that the cracks were caused by ongoing "foundation movement" and not the leak in the radiant system (Def. Exh. 4 at 4). In his report, he stated that foundation movement may occur slowly or incrementally over a period of time without creating noticeable cracks. All materials were able to accommodate some level of strain without cracking. If the elastic properties of the material were exceeded, however, a sudden fracture would result. Foundation movement often resulted from soil saturation caused by poor drainage, over-irrigation, pipe leaks, or soil shrinkage due to desiccation. If movement were caused by soil saturation, relatively large areas of soil would have to be involved. Here, he found no indication of widespread soil saturation resulting from the leak in the radiant floor system. Rather, there must have been foundation movement that "had been ongoing for a long period of time, years rather than months or weeks, and was related to the soil and drainage conditions and not related to the radiant heat system leak" (*ibid.*). In Engineer Miller's inspection report, he also noted that "an area of increased moisture was discovered at the front wall of the dining room, near the kitchen. American Leak Detection had marked this area with blue tape to indicate the location of a radiant heat system leak. The area of increased moisture was observed for a diameter of about four feet" (*id.* at 3).

The insureds then hired Berlogar Geotechnical Consultants to investigate the cause of cracking in their kitchen and dining room and to respond to the Miller report. Geotechnical engineering expert Frank Berlogar authored a one-and-a-half page, double-spaced draft report dated October 28, 2005 (Pl. Exh. 11). At the time of drafting, he knew that plaintiffs disputed the extent (or lack of) insurance coverage by USAA. He intended to "assist Murphree/Anderson in pursuing their insurance claim" (Pl. Exh. 6 at 67–68). The October 28 report disagreed with Engineer Miller's conclusion that foundation movement had been ongoing over a long period of time and was unrelated to leakage in the radiant heating system. Engineer Berlogar, however, did not perform any floor-level surveys; he merely conducted a visual inspection. He based his assertions on what was reported to him by plaintiffs.

There is nothing in the summary-judgment record from which a jury could reasonably conclude the Berlogar draft report was given to USAA prior to the denial letter. The memorandum filed by plaintiffs' counsel overlooks this point in the chronology. The Court on its own reviewed the summary-judgment record to try to find the answer. There is no affirmative proof that the Berlogar draft report was ever given to USAA prior to the denial letter sent in November 2005. At his deposition, Engineer Berlogar testified that he never spoke to Engineer Miller, nor did he think that it would be helpful to confer with Engineer Miller regarding Miller's opinions on plaintiffs' property damage. The indicators in the record point towards plaintiffs' counter report being provided to the insurance company at a later time, as will be discussed below.

Meanwhile, Adjuster Cady prepared a Coverage Question Decision File Report for his supervisor Maureen Swartz. Ms. Swarz reviewed the Miller report and, by note, instructed Adjuster Cady, "DAVID, I HAVE REVIEWED THE PHOTOS, DOCS, ENGINEER REPORT, AND LEAK DETECTION REPORT, OK TO DISCLAIM AS CAUSE IS LONG TERM SETTLING" (Pl. Exh. 8 at 74). Accordingly, Adjuster Cady sent a denial letter on November 18, 2005. The letter stated that "[o]ur investigation reveals that the cracks are due to normal wear and tear and earth movement. Based on the information gathered, we are [not] able to

cover the resulting damages caused by the wear and tear and earth movement" (Def. Exh. 5).[1]

Berlogar engineer Gregory Hanson, who was also hired by plaintiffs, conducted a site inspection and reviewed the Miller report. In his April 2006 report, Engineer Hanson disagreed with the Miller report and concluded that the cracking resulted from the radiant heat system leak. He based his conclusions on soil tests, timing of the leak and distress, and the sudden nature of the distress. He opined that the leak, which was "known to have occurred in the area of the recent distress and at the same time, would have saturated the highly expansive nearsurface soil, resulting in uplift of the slab and foundation elements. This would account for the sudden appearance of the recent distress — which we observed to be very different and more pronounced than the older, more minor and scattered cracking" (Pl. Exh. 1).

Engineer Hanson's conclusions were provided to USAA in May 2006. The cover letter from plaintiffs' counsel to Adjuster Cady stated, "I have reviewed the EFI Global Reported [sic] dated September 20, 2005, which was forwarded to my clients in support of USAA's decision to deny the claim. I found the report lacking in evidence of investigative effort on the part of the engineer, and the conclusions unsubstantiated by documentation. I therefore recommended that the issue of causation of the damage be investigated by Frank Berlogar, a highly-regarded geotechnical engineer in this area. His report of April 14, 2006 [completed by a Berlogar employee, Engineer Hanson] is enclosed" (Pl. Exh. 13).

By this time, Adjuster Dunkly had returned from Katrina duty and resumed the handling of plaintiffs' claim. In June 2006, he requested that Engineer Miller review Engineer Hanson's report. Engineer Miller did not change his opinion. Adjuster Dunkly spoke with in-house USAA counsel Richard Fox, who recommended that Adjuster Dunkly seek permission from plaintiffs' counsel for a third expert to evaluate the claim. Attorney Fox recommended GeoForensics. In July 2006, Adjuster Dunkly wrote to plaintiffs' counsel, proposing to have an

---

[1] Due to a typographical error, Adjuster Cady omitted the word "not" from the denial letter. Nonetheless, plaintiffs understood the letter to be a denial of their claim.

7

1 additional expert, geotechnical engineer Daniel Dyckman of GeoForensics, inspect the property
2 and draft another report. Plaintiffs agreed to have Engineer Dyckman inspect their property.[2]
3     Engineer Dyckman issued his evaluation report in October 2006. He opined "that the
4 primary cause of all distress at this site is the poor quality of foundation construction used at
5 this site which has allowed expansive soil movements to be readily transmitted to the
6 poorly/un-reinforced brittle structure" (Def. Exh. 8). Engineer Dyckman noted that the
7 moisture measurements of soil under the area of potential leakage were actually lower than that
8 found under other areas of the house. This observation, according to Engineer Dyckman,
9 "suggests that leakage of water from the radiant floor system [was] not a significant cause of the
10 observed damage" (*ibid.*). After Engineer Dyckman submitted his report to USAA,
11 Adjuster Dunkly spoke with Attorney Fox and his supervisor. USAA reaffirmed its denial by
12 letter dated November 3, 2006.
13     Shortly thereafter, plaintiffs filed suit against defendant USAA in California Superior
14 Court for: (i) breach of contract; and (ii) breach of the implied covenant of good faith and fair
15 dealing. They also sought punitive damages. The action was removed to federal court on
16 diversity grounds; plaintiffs are citizens of California while defendant is incorporated and has
17 its principal place of business in Texas.

**ANALYSIS**

19     Summary judgment is granted when "the pleadings, depositions, answers to
20 interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
21 genuine issue as to any material fact and that the moving party is entitled to a judgment as a
22 matter of law." FRCP 56(c). A district court must determine, viewing the evidence in the light
23 most favorable to the nonmoving party, whether there is any genuine issue of material fact.
24 *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007). A genuine issue
25 of fact is one that could reasonably be resolved, based on the factual record, in favor of either

---

[2] Contrary to defendants, plaintiffs' letter did not "confirm[] plaintiffs' agreement to allow Engineer Dyckman to conduct the tie breaking evaluation of the cause of loss" (Br. 9). Rather, the letter merely confirmed the date of inspection of plaintiffs' residence by Engineer Dyckman (Def. Exh. 7). Neither party has provided the July 2006 letter allegedly proposing that Engineer Dyckman resolve any difference of opinion between the two parties.

8

party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).[3]

The moving party "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F. 3d 1099, 1102 (9th Cir. 2000). When the moving party meets its initial burden, the burden then shifts to the party opposing judgment to "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### 1. PLAINTIFFS' BREACH-OF-CONTRACT CLAIM.

Plaintiffs contend that USAA breached the insurance contract when USAA denied coverage for the damage to plaintiffs' property. "While the burden is on the insurer to prove a claim covered falls within an exclusion, the burden is on the insured initially to prove that an event is a claim within the scope of the basic coverage." *Royal Glove Ins. Co. v. Whitaker*, 181 Cal. App. 3d 532, 537 (1986). "[O]nce the insured shows that an event falls within the scope of basic coverage under the policy, the burden is on the insurer to prove a claim is specifically excluded." *Garvey v. State Farm Fire & Casualty Co.*, 48 Cal. 3d 395, 406 (1989). Furthermore, "insurance coverage is 'interpreted broadly so as to afford the greatest possible protection to the insured, [whereas] . . . *exclusionary clauses are interpreted narrowly against the insurer.*' . . . Thus, 'the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language.' The exclusionary clause 'must be conspicuous, plain and clear.' This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded." *MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 648 (2003) (emphasis added). "The test [for contractual interpretation] is what a reasonable person in the position of an insured would have understood the words to mean." *Pieper v. Commercial Underwriters Ins. Co.*, 59 Cal. App. 4th 1008, 1016 (1997).

---

[3] Unless indicated otherwise, internal citations are omitted from all cites.

9

USAA first argues that plaintiffs failed to prove that the cracking in the walls and floors of their home was covered under the USAA homeowners insurance policy. Not so. According to the policy, "[USAA] insure[s] against risks of direct, physical loss to property described in Coverages A and B" (Def. Exh. 1). Coverage A refers to coverage of "dwellings," which include (but are not limited to) "the dwelling on the residence premises shown in the Declarations, including structures attached to the dwelling" and "materials and supplies located on or next to the residence premises used to construct, alter or repair the dwelling or other structures on the residence premises." The "residence premises shown in the Declarations" was the property at issue (*ibid.*). The policy defines "property damage" as "physical damage to, or destruction of tangible property, including loss of use of this property" (*ibid.*). The cause of the damage is disputed; both sides have presented expert opinions as to the cause. Assuming *arguendo* that leakage was the cause, a reasonable person in the position of Mr. Anderson and Ms. Murphree would have understood the damage to be direct, physical loss to their dwelling — which, when viewing the evidence in the light most favorable to the non-moving party, could fall within the scope of basic coverage.

USAA contends that its policy provisions did *not* cover wall and floor cracking. One exception stated, "[W]e do not insure loss . . . **3.** Caused by or consisting of . . . **f.** settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings" (*ibid.*). But if read narrowly and in favor of the insured, per *MacKinnon*, the exception did not exclude loss caused by leakage from the radiant heating system, hence the battle of experts over what caused the cracking. The source of the damage is a genuine issue of material fact.

Even assuming that the cause of the loss was water leakage, defendant argues, USAA still would not be liable for the loss. Under the policy, "[USAA] do[es] not insure loss . . . **2.** caused by . . . **e.** constant or repeated seepage or leakage of water or steam over a period of weeks, months or years from within a plumbing, heating, air condition or automatic fire protective sprinkler system or from within a household appliance" (Exh. 1). This provision, however, would apply only if the water leakage occurred over a period of weeks, months or

10

years. Over what time period any leak occurred is another disputed issue of material fact. USAA claims that it occurred over a long time ago. Mr. Anderson, defendant says, admitted that the radiant heating system had sprung leaks in the past that he repaired. Furthermore, an examination of water-usage records did not indicate any sudden water-usage increase around the time plaintiffs reported the damage to USAA. Defendant concludes, "The onset of the leak could have occurred years prior to its discovery" (Br. 16). That is, however, not the standard by which a party moving for summary judgment prevails. A district court must view the evidence in the light most favorable to the nonmoving party. Here, plaintiffs offer expert evidence that the damage was caused by a sudden leakage in August 2005. They returned from a trip to find damage that had not been there before. When the leak started is a factual issue that could be reasonably resolved in favor of either party.

Defendants further argue that, even if the loss were to fall within the initial scope of coverage, it would be excluded under the earth movement, subsurface water and/or faulty, negligent or inadequate construction exclusions of the policy. To reiterate the standard under *MacKinnon*, "exclusionary clauses are interpreted narrowly against the insurer." 31 Cal. 4th at 648. If water leakage resulting from the radiant heating system caused the damage, these exclusions would not apply. *First*, assuming the damage was caused by leakage and not foundation movement, the earth-movement exclusion would be inapplicable. *Second*, a narrow interpretation of the water-damage exclusion lends itself to the same conclusion. The water-damage exclusion referred to "water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure." Leakage from a radiant heating system, however, did not constitute subsurface waters. *Third*, the faulty-negligent exclusion would be inapplicable if plaintiffs were correct in alleging leakage rather than poor quality-foundation construction as the cause of property damage. Given these disputes of material fact, summary judgment cannot be granted in favor of USAA for the breach-of-contract claim.

11

### 2. PLAINTIFFS' BAD FAITH CLAIM.

The insurer has a duty to act in good faith. "The covenant of good faith and fair dealing is implied in law to assure that a contracting party 'refrain[s] from doing anything to injure the right of the other to receive the benefits of the agreement.'" *Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1292–93 (2000). Plaintiffs contend that USAA acted in bad faith. The ultimate test of bad faith liability is whether the refusal to pay policy benefits or the alleged delay in paying was unreasonable, which is ordinarily a question of fact. *Chateau Chamberay Homeowners Ass'n v. Associated International Ins. Co.*, 90 Cal. App. 4th 335, 346 (2001). According to *Fraley*, 81 Cal. App. 4th at 1292–93, there is, however, the genuine-dispute doctrine that allows a court to conclude as a matter of law on a summary judgment that an insurer's claim denial was not unreasonable:

> It is well established that 'bad faith liability cannot be imposed where there exist[s] a genuine issue as to [the insurer's] liability under California law.' '[A] court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability.' The 'genuine dispute' doctrine may be applied where the insurer denies a claim based on the opinions of experts.

The Supreme Court of California recently approved the genuine-dispute doctrine, as articulated in *Fraley*. *See Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 723–24 (2007).

Of course, "an expert's testimony will not *automatically* insulate an insurer from a bad faith claim based on a biased investigation." *Chateau Chamberay*, 90 Cal. App. 4th at 348 (emphasis in original). The state court in *Chateau Chamberay* then suggested several circumstances where a biased investigation claim should go to the jury: "(1) the insurer was guilty of misrepresenting the nature of the investigatory proceedings; (2) the insurer's employees lied during the depositions or to the insured; (3) the insurer dishonestly selected its experts; (4) the insurer's experts were unreasonable; and (5) the insurer failed to conduct a thorough investigation." *Id.* at 348–49. There must be *factually supported* suggestions of bias in the record. *Id.* at 349. In the instant action, however, there were no such facts suggesting any of the aforementioned circumstances.

12

USAA argues persuasively that the bad-faith claim should be dismissed on summary judgment because there was a genuine dispute as to its liability. Furthermore, it based its decision on expert opinions, which further supported application of the genuine-dispute rule, defendant says. USAA had hired experts Engineer Miller and Engineer Dyckman to inspect the property and opine about the cause of the damage. They agreed that foundation movement caused the cracking. The insurance company then based its denial of the claims on these expert opinions.

Although the summary-judgment record is insufficient in the Court's view with respect to the bad-faith claim, the best case for plaintiffs on this record would go as follows. USAA hired Engineer Miller to do the investigation. Engineer Miller had been hired by USAA on as many as twenty previous occasions. Based on the Miller report, the insurance company denied plaintiffs' claim.

It is important to remember, however, that Berlogar's counter report had not yet been sent to or reviewed by USAA. There is nothing per se wrong with an insurance company relying on its own retained experts or employees. "Where the parties rely on expert opinions, even a substantial disparity in estimates for the scope and cost of repairs does not, by itself, suggest the insurer acted in bad faith. Despite the 'special relationship' between an insurer and its insureds, an insurer 'may give its own interests consideration equal to that it gives the interests of its insured[s].'" *Fraley*, 81 Cal. App. 4th at 1293. Rather, what would be despicable would be for USAA to knowingly rely upon someone who was corrupted and whose professional integrity should not be trusted. Here, however, it would be too great a leap to conclude that Engineer Miller was so corrupted simply because he had performed for USAA on at least twenty prior occasions.

Furthermore, there was no evidence that the second expert from GeoForensics, Engineer Dyckman, was a biased "hired gun" of the insurance industry or that he had ever worked for USAA, contrary to plaintiffs' verbal argument at the hearing. During his deposition, Adjuster Dunkly testified that Attorney Fox recommended that USAA use an expert from GeoForensics. Adjuster Dunkly did not recall why Attorney Fox recommended GeoForensics,

13

whether Attorney Fox was familiar with any of the engineers at GeoForensics, or whether USAA had ever used GeoForensics in prior USAA claims. Adjuster Dunkly himself had no knowledge of or familiarity with GeoForenics, nor did he ever use GeoForensics or anyone employed by GeoForensics (aside from this particular case) (Pl. Exh. 7 at 93–94). It is noteworthy that, at Engineer Dyckman's deposition, he was asked at the bottom of page 10 of the transcript, "Have you been retained by insurance carriers in the past directly?" Plaintiffs chose to omit page 11, which presumably would have contained Engineer Dyckman's response (Pl. Exh. 9 at 10). Nothing in the record supports the theory of a biased investigation by Engineer Dyckman.

Because USAA, the moving party, has met its initial burden, the burden then shifts to plaintiffs to show that there is a genuine issue for trial. Mr. Anderson and Ms. Murphree have the obligation to present evidence from which a jury could reasonably conclude USAA acted in bad faith. They have failed to do so. USAA hired two experts to investigate the damage on plaintiffs' property. One of the experts, Engineer Miller, even provided a supplemental report in response to plaintiffs' expert analysis of the cracking. Objectively speaking, USAA has done a thorough and diligent job investigating the cause of damage, including taking into account the counteropinions of plaintiffs' expert. There is no evidence from which a jury could reasonably conclude there was a biased investigation or that USAA did not actually hold the opinions expressed in its denial letter and by its experts. Summary judgment is granted with respect to plaintiffs' bad-faith claim. Because there is no valid bad-faith claim, plaintiffs cannot recover punitive damages. Summary judgment must also be granted with respect to plaintiffs' claim for punitive damages.[4]

---

[4] USAA contacted and retained claims-handling expert Gilbert Malmgren to conduct a review of the Anderson/Murphree claim file and USAA's claim handling. Mr. Malmgren opined that USAA "not only acted reasonably and within the standard of practice of the insurance industry in the manner in which they investigated the facts and determined its coverage position with regard to the subject claim, but I believe that USAA went a step above and beyond the standard of practice by hiring a second expert after it was determined that there was a difference of opinion between the first expert retained by USAA to evaluate the cause of the loss and the expert retained by the plaintiffs" (Malmgren Decl. ¶ 7). Plaintiffs object to this testimony, citing *Dalrymple v. United Services Automobile Association*, 40 Cal. App. 4th 497 (1995). They claim that the issues covered in Mr. Malmgren's testimony are legal subjects to be determined by a court and are not subject to expert testimony. This issue need not be reached because this order did not take Mr. Malmgren's testimony into

**CONCLUSION**

For the foregoing reasons, the motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

Dated: March 4, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

account.